NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 14-5316

# In the United States Court of Appeals for the District of Columbia

**TRUE THE VOTE, INC.**,

*Plaintiff-Appellant*,

v.

**INTERNAL REVENUE SERVICE**, *et al.*

*Defendants-Appellees*,

On Appeal from the United States District Court for the District of Columbia

The Honorable Reggie B. Walton
United States District Court Judge
Case No. 1:13-cv-00734-RBW

**BRIEF FOR APPELLANT**

Cleta Mitchell
Michael J. Lockerby
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com

Kaylan L. Phillips
Noel H. Johnson
PUBLIC INTEREST LEGAL FOUNDATION
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@publicinterestlegal.org
njohnson@publicinterestlegal.org

*Counsel for Plaintiff-Appellant (additional counsel listed inside front cover)*

*Additional Counsel:*

William E. Davis
Mathew D. Gutierrez
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
mgutierrez@foley.com

John C. Eastman
CENTER FOR CONST'L JURISPRUDENCE
c/o Chapman University Fowler School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu

## Certificate as to Parties, Rulings, and Related Cases

**A.     Parties**

The parties to the above-captioned appeal are the following:

<u>Plaintiff-Appellant</u>

1.  True the Vote, Inc.

<u>Defendants-Appellees</u>

1.  United States of America

2.  Internal Revenue Service

3.  John A. Koskinen, in his official capacity as Commissioner of the Internal Revenue Service.[1]

4.  Steven T. Miller, in his individual capacity.

5.  Douglas H. Shulman, in his individual capacity.

6.  William Wilkins, in his individual capacity.

7.  Lois Lerner, in her individual capacity.

8.  Holly Paz, in her individual capacity.

9.  Cindy M. Thomas, in her individual capacity.

10. Steven Grodnitzky, in his individual capacity.

---

[1] Steven T. Miller and Daniel Werfel, who each served as Acting Commissioner of the Internal Revenue Service at various times during this litigation, were previously named as defendants, in their official capacities as Commissioner of the Internal Revenue Service, but were substituted as parties when replaced by their successor in office.

11. David Fish, in his individual capacity.

12. Michael C. Seto, in his individual capacity.

13. Susan Maloney, in her individual capacity.

14. Ronald Bell, in his individual capacity.

15. Janine L. Estes, in her individual capacity.

16. Faye Ng, in her individual capacity.

17. Unknown Named Employees of the Internal Revenue Service, in their individual capacities.[2]

## B.    Rulings Under Review

Appellant True the Vote seeks review of the Order (JA-197) and Memorandum Opinion (JA-199) of Judge Reggie B. Walton entered on October 23, 2014, granting the motions to dismiss filed by the Appellees (Dkts. 54, 63, and 64) and denying as moot Appellant's Motion to Stay Agency Action (Dkt. 68).

## C.    Related Cases

Appellant True the Vote is aware of the following case that presents

---

[2] Each of the Appellees named in his or her individual capacity was also named in his or her official capacity in the Amended Complaint pursuant to 5 U.S.C. § 706, which permits the United States to be named as a defendant in an action pursuant to the Administrative Procedure Act, provided that "any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

substantially similar issues as those involved in this appeal:[3]

    1. *Linchpins of Liberty v. U.S.*, No. 15-5013 (D.C. Circuit)

This case has not previously been before this Court or any other court of appeals.

---

[3] A related case was recently decided by this Court, *Z St. v. Koskinen*, No. 15-5010 (D.C. Circuit).

## Corporate Disclosure Statement

Appellant True the Vote, Inc., is a tax-exempt entity under Section 501(a) of the Internal Revenue Code as a charity described in Section 501(c)(3). True the Vote, Inc., has no parent corporation and no publicly-held corporation has a 10% or greater ownership interest in it.

## Table of Contents

Certificate as to Parties, Rulings, and Related Cases ................................ i

Corporate Disclosure Statement ........................................... iv

Table of Authorities ................................................... vii

Glossary.................................................................x

STATEMENT OF JURISDICTION.........................................1

ISSUES PRESENTED FOR REVIEW ....................................1

STATUTES AND REGULATIONS.......................................2

STATEMENT OF THE CASE............................................2

    Procedural background ...........................................2

    Factual background..............................................4

    The Targeting Scheme Was the Result of an Agency-Wide Culture of Bias Against Conservative Groups ......................................7

    The IRS Developed the Targeting Scheme in Secret and Repeatedly Misled or Obstructed Congress's Investigations.................................9

SUMMARY OF THE ARGUMENT ....................................12

ARGUMENT ...................................................13

    I.   Standard of Review ........................................13

    II.  The District Court Erred in Finding the Claims for Injunctive and Declaratory Relief Moot...................................14

        A.  TTV Faces the Imminent Threat of Viewpoint Discrimination...........15

        B.  The Targeting Scheme Continues to Injure TTV.................18

          1.   TTV's First Amendment Rights Are Currently Chilled................18

          2.   The IRS's Continued Possession of Materials Unlawfully Collected Pursuant to the Targeting Scheme Injures TTV. ....................20

          3.   The Public Disclosure of Materials Unlawfully Collected Pursuant to the Targeting Scheme Injures TTV. ....................22

    III. The District Court Erred in Dismissing TTV's *Bivens* Claims. ................24

A.  The Bivens Standard..........................................................................24

B.  No Adequate, Alternative Remedies Exist for TTV's Constitutional Injuries. ...............................................................................................25

C.  "Special factors" Do Not Preclude a *Bivens* Remedy. .........................27

1.   *Kim* Is Materially Distinguishable, Omits Necessary Analysis, and Should be Limited to its Context. ...............................................28

2.   The District Court Ignored Legislative History Demonstrating that the IRC's Remedies Should Complement, not Preempt, *Bivens* Remedies. ..................................................................................30

IV. The District Court Erred In Dismissing Count IV. ...................................33

A.  Count IV Alleges Improper Inspection, not Acquisition, of its Application Material. ..................................................................................33

B.  TTV's Claims Were Sufficiently Pleaded. ...........................................38

CONCLUSION ...............................................................................................41

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements ............................................................................42

ADDENDUM

CERTIFICATE OF SERVICE

# Table of Authorities[4]

## Cases

*AFL-CIO v. FEC*, 333 F.3d 168 (D.C. Cir. 2003) ....................................................23

*\*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ..................................................................................... 1, 3, 13, 24, 26

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................22

*Bush v. Lucas*, 462 U.S. 367 (1983) .....................................................................25

*Carlson v. Green*, 446 U.S. 14 (1980) ......................................................... 26, 27, 32

*Chandler v. United States*, 687 F. Supp. 1515 (D. Utah 1988) ..............................37

*Church by Mail, Inc. v. United States*, No. 87-0754, 1988 WL 8271 (D.D.C. Jan. 22, 1988) .........................................................................................................25

*\*Church of Scientology v. United States*, 506 U.S. 9 (1992) ........................... 21, 22

*Clark v. Library of Cong.*, 750 F.2d 89 (D.C. Cir. 1984)........................................19

*Coal. for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003) .......14

*Dean v. United States*, 2010 U.S. Dist. LEXIS 29576 (D.N.J. 2010) ....................39

*Dickerson v. United States*, 530 U.S. 428 (2000) ...................................................18

*Erickson v. Pardus*, 551 U.S. 89 (2007) ...............................................................14

*Freedman v. Maryland*, 380 U.S. 51 (1965)..........................................................18

*Fund for Animals v. Mainella*, 335 F. Supp. 2d 19 (D.D.C. 2004) ........................14

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)..................................................18

*Huff v. United States*, 10 F.3d 1440 (9th Cir. 1993)...............................................35

*In re AOV Indus., Inc.*, 797 F.2d 1004 (1986) .....................................................7 n.8

*Kim v. United States*, 618 F. Supp. 2d 31 (D.D.C. 2009)........................................29

*Kim v. United States*, 632 F.3d 713 (D.C. Cir. 2011)................................. 24, 28, 29

*Mann v. United States*, 204 F.3d 1012 (10th Cir. 2000)................................... 35, 37

*Marsoun v. United States*, 591 F. Supp. 2d 41 (D.D.C. 2008) ...............................29

*May v. United States*, 1992 U.S. Dist. LEXIS 16055 (W.D. Mo. Apr. 17, 1992)...39

*\*Minneci v. Pollard*, 132 S.Ct. 617 (2012).......................................................... 24, 26

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958)..........................................23

*\*Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994)........30

---

[4] Authorities upon which TTV chiefly relies are marked with asterisks.

*Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240 (10th Cir. 1989)..............................................................30

*NorCal Tea Party Patriots v. IRS*, 2014 U.S. Dist. LEXIS 97229 (S.D. Ohio 2014) ..............................................................................34-35

*Scandinavian Satellite Sys. v. Prime TV Ltd.*, 291 F.3d 839 (D.C. Cir. 2002)........14

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988).................................................25

*Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169 (D.C. Cir. 2006) .................................14

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) .....................................................14

*United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984)..............19

*United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012) ..............................................................................7 n.8

*Venen v. United States*, 38 F.3d 100 (3d Cir. 1994) ................................................35

*Wilkerson v. United States*, 67 F.3d 112 (5th Cir. 1995)...................................35-36

*Wilkie v. Robbins*, 551 U.S. 537 (2007)......................................................25, 27-28

*Wilson v. Libby*, 498 F. Supp. 2d 74 (D.D.C. 2007)...............................................28

*Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008).........................25, 28 n.12, 30, 32

*Z St. v. Koskinen*, 791 F.3d 24 (D.C. Cir. 2015).............................................iii, 27

*Zherka v. Ryan*, 2014 U.S. Dist. LEXIS 140564 (S.D.N.Y. 2014) ........................30

**Statutes**

5 U.S.C. § 702 ............................................................................................................1

26 U.S.C. § 6033 ......................................................................................................15

26 U.S.C. § 6103 ..........................................................................................33, 34, 40

26 U.S.C. § 6103(k)(6).............................................................................................35

26 U.S.C. § 6104(a)(1)(A) ........................................................................................22

26 U.S.C. § 6684 ......................................................................................................15

26 U.S.C. § 6852 ......................................................................................................15

26 U.S.C. § 7428 ............................................................................1, 2, 15, 27, 36, 37

26 U.S.C. § 7431 ..............................................................1, 3, 33, 34, 36, 37, 38, 39

26 U.S.C. § 7433 ............................................................................................30, 32, 36

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

28 U.S.C. § 1346(e) ...................................................................................................1

28 U.S.C. § 2201 ........................................................................................................1

Fed. R. Civ. P. 12(b)(1)............................................................ 13, 14

Fed. R. Civ. P. 12(b)(6)............................................................ 14, 34

Fed. R. Civ. P. 8(a)(2) ...............................................................38

**Other Authorities**

134 Cong. Rec. 28285, 29273 (Oct. 7, 1988) ..........................................32

*Conference Report to Accompany H.R. 4333*, Vol. 2, 100th Cong. 2nd Sess. (Oct. 21, 1988) ............................................................................32

GAO Report ...........................................................................17

H.R. 4333, 100th Cong., 2nd Sess. (1988) ............................................32

H.R. 634, 100th Cong., 1st Sess., § 9(a) (1987) ......................................31

House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013) (http://waysandmeans.house.gov/hearing-on-the-internal-revenue-services-exempt-organizations-division-post-tigta-audit/...................................................9

June 10, 1976 report of the Senate Committee on Finance on the Tax Reform Act of 1976 (HR 10612) ...............................................................27

Letters between Cleta Mitchell to Grover Hartt (May 9, 2014, May 16, 2014)......16

S. 2238, 100th Cong., 2nd Sess., § 779 (1988).......................................32

S. 579, 100th Cong., 1st Sess., § 3(a) (1987).........................................31

Taxpayers Bill of Rights: Hearings on S. 579 and S. 604 Before the Subcommittee on Private Retirement Plans and Oversight of the IRS of the Senate Committee on Finance at 243, 100th Cong., 1st Sess. 177 (Apr. 10, 1987) (statement of Lawrence B. Gibbs, Commissioner, IRS)............................................31

*The [IRS's] Targeting of Conservative Tax-Exempt Applicants: Report of Findings for the 113th Congress* (Dec. 23, 2014)...............................6-12, 18, 40

**Glossary**

| Term | Definition |
|---|---|
| BOLO | "Be On the Lookout" list used by the Exempt Organizations division of the Internal Revenue Service |
| Cincinnati Appellees | Appellees Susan Maloney, Ronald Bell, Janine L. Estes, and Faye Ng |
| EO | Exempt Organizations division of the Internal Revenue Service |
| Government | Appellees United States of America, Internal Revenue Service, and Commissioner John Koskinen |
| Individual Appellees | Management Appellees and Cincinnati Appellees |
| Management Appellees | Appellees Steven Grodnitzky, Lois Lerner, Steven Miller, Holly Paz, Michael Seto, Douglas Shulman, Cindy Thomas, and William Wilkins |
| TTV | Appellant True the Vote |

x

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction pursuant to 26 U.S.C. § 7431, 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 5 U.S.C. § 702, and also under 28 U.S.C. § 1346(e) because of Plaintiff's 26 U.S.C. § 7428 claim.

This is an appeal of the district court's October 23, 2014 order disposing of all claims.[5] (JA-197.)[6] True the Vote (hereinafter, "TTV") timely appealed the order on December 18, 2014. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Did the district court err in dismissing TTV's First Amendment and Administrative Procedure Act ("APA") (Counts II and V) claims against the Government as moot?

2.    Did the district court err in dismissing TTV's request to stay agency action as moot?

3.    Did the district court err in holding that TTV's First Amendment claim for monetary damages pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (Count III) was non-cognizable against IRS officials?

---

[5] TTV does not appeal the dismissal of the section 7428 claim (Count I).

[6] "JA" references the Joint Appendix. "Dkt." references documents not in the Joint Appendix, as numbered on the district court's docket.

1

4.     Did the district court err in holding that TTV's Amended Complaint failed to state a claim for relief based on unlawful inspections of tax-return information (Count IV)?

## STATUTES AND REGULATIONS

The text of 26 U.S.C. §§ 7428 and 7431 are set forth in the Addendum. *See* D.C. Cir. Rule 28(a)(5).

## STATEMENT OF THE CASE

### *Procedural background*

On July 15, 2010, Appellant TTV filed its application for recognition as a tax-exempt entity with the Internal Revenue Service ("IRS"). (JA-33, ¶ 53.) Pursuant to a viewpoint-based policy that identified and subjected certain organizations to heightened review and scrutiny (the "Targeting Scheme"), the IRS intentionally delayed TTV's application for over three years, and propounded numerous, unnecessary, and burdensome requests for information on TTV. (JA-36-49, ¶¶ 73-129.) TTV was forced to comply with each of those requests. (JA-34-35, ¶¶ 57, 64, 67.)

On May 21, 2013, TTV filed its Verified Complaint (Dkt. 1), seeking the following relief:

- Count 1: declaratory judgment under 26 U.S.C. § 7428 establishing that TTV is a tax-exempt charitable and educational organization;

2

- Count 2: declaratory and injunctive relief to prevent further infringement of TTV's constitutional rights;

- Count 3: damages under *Bivens*, resulting from violations of TTV's constitutional rights;

- Count 4: damages under 26 U.S.C. § 7431 for unlawful inspection of TTV's tax-return information; and,

- Count 5: declaratory and injunctive relief from APA violations.

On July 22, 2013, TTV amended its complaint to add defendants. (JA-17.) On September 20, 2013, the Government moved to dismiss, claiming that Counts I, II, and V were moot because the IRS had finally determined to grant TTV's application for tax-exempt status. (Dkt. 54 at 1.) On September 26, 2013, the IRS issued its determination letter to TTV. (Dkt. 65-1.)[7] On October 18, 2013, the Individual Appellees moved to dismiss. (Dkts. 63-64.) TTV filed the Motion to Stay Agency Action (Dkt. 68), seeking to prevent the IRS from making public certain confidential application materials unlawfully collected by the IRS during the Targeting Scheme. TTV also filed Oppositions to the Motions to Dismiss (Dkt. 65, 67.)

While the Motions were pending, it was reported that the hard drive in

---

[7] But the IRS failed to add TTV to its public list of exempt organization, causing further damages, *infra*.

3

Appellee Lerner's work computer crashed just ten days after Congress began an inquiry into the targeting of conservative organizations. TTV moved for a preliminary injunction and expedited discovery to prevent further loss of evidence. (Dkt. 83.) At the motion hearing, the court ordered the IRS to provide affidavits regarding attempts to restore the hard drive. (Dkt. 91.) These affidavits were filed on July 18, 2014. (Dkts. 92-1, 92-2, 92-3.) On August 7, 2014, the Court denied TTV's motion. (Dkt. 96.)

On October 23, 2014, the district court granted Appellees's Motions to Dismiss. (JA-197.) It held that it lacked subject-matter jurisdiction for Counts I, II, and V, and the motion to stay agency action, reasoning that those claims became moot once the IRS granted TTV's application. (JA-206-211.) The court dismissed Count III for failure to state a claim upon which relief could be granted, holding that *Bivens* claims are non-cognizable against IRS officials. (JA-211-215.) Lastly, the district court held that Count IV failed to state a claim for unlawful inspection of tax-return information. (JA-215-220.)

### *Factual background*

On May 10, 2013, in response to a planted question at an American Bar Association event, Appellee Lerner apologized for the IRS's targeting of certain applicants for tax-exempt status. (JA-37-38, ¶¶ 77-81.) Lerner admitted that the IRS selected organizations for heightened review, scrutiny, and delay simply

because of their conservative-sounding names. (JA-37, ¶ 77.) She further admitted that the IRS "ask[ed] questions of the[] organizations that weren't really necessary for the type of application." (JA-37, ¶ 78(b).) Lerner described the IRS's actions as "wrong…absolutely incorrect, insensitive, and inappropriate." (JA-37, ¶ 78(a).)

Lerner's apology was designed to mitigate the damage of an audit report prepared by the Treasury Inspector General for Tax Administration ("TIGTA"), which Lerner knew would be made public a few days later (hereafter, the "TIGTA Report"). (JA-130.) According to the TIGTA Report:

> The IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention. Ineffective management: 1) allowed inappropriate criteria to be developed and stay in place for more than 18 months, 2) resulted in substantial delays in processing certain applications, and 3) allowed unnecessary information requests to be issued.

(JA-132.) Among the criteria used to target applicants were conservative-sounding names like "Tea Party" or "Patriots," or whether the case file included certain viewpoints and policy positions such as statements critical of how the country was being run or aimed at educating the public on how to "make America a better place to live." (JA-142.)

When TTV applied for tax-exempt status in July 2010, its name was "KSP/True the Vote." (JA-33, ¶¶ 50-52.) "KSP" stood for "King Street Patriots," its affiliated Section 501(c)(4) social-welfare organization. (JA-86.) Thus, TTV

was unwittingly thrust into the Targeting Scheme because of its *name*.

For over three years, TTV's application was deliberately delayed while the IRS propounded numerous, unnecessary, and burdensome questionnaires seeking proprietary information about TTV's operations, activities, leadership, volunteers, associations, and affiliations. The IRS knew that the information sought was wholly unnecessary to the determination of TTV's tax-exempt status and was well beyond the scope of information normally sought from applicants. (JA-154.) TTV was required to disclose confidential information, because failure to cooperate would automatically close TTV's file. (JA-116.) The IRS then willingly inspected the wrongfully obtained information. That information is still in the IRS's possession and is now open to public inspection.

On December 23, 2014, the House Oversight Committee released its report of the Committee's factual findings and conclusions regarding the IRS Targeting Scheme. U.S. House of Representatives, Committee on Oversight and Government Reform, *The [IRS's] Targeting of Conservative Tax-Exempt Applicants: Report of Findings for the 113th Congress* (Dec. 23, 2014), *available at* https://oversight.house.gov/wp-content/uploads/2014/12/December-2014-IRS-Report.pdf ("Oversight Report").[8]

---

[8] The district court relied upon judicial notice to find that the IRS has "suspended the alleged scheme." (*See* JA-208 n.7.) After the district court's order,

6

**The Targeting Scheme Was the Result of an Agency-Wide Culture of Bias Against Conservative Groups**

The Oversight Report further demonstrates that the Targeting Scheme originated at the top of the IRS. In October 2010, "fielding questions during the combative midterm election campaign season," President Obama expressed concern that "'there is an awful lot of corporate money that's pouring into [] elections right now'" by organizations with "innocuous-sounding names." Oversight Report, Executive Summary at i (citations omitted). According to the President, "I think that is a problem for our democracy. And it's a direct result of a Supreme Court decision that said they didn't have to disclose who their donors are." *Id*. Days later, Appellee Lerner repeated the President's concerns by saying, "'The Supreme Court dealt a huge blow…. And everyone is up in arms because they don't like it…. They want the IRS to fix the problem…." *Id*. (citations

---

governmental entities released updated reports refuting such a finding. TTV requests that this Court consider this evidence when evaluating subject matter jurisdiction. "Although [this Court] normally do[es] not consider evidence presented for the first time on appeal, [it] ha[s] discretion to make 'limited exceptions to this rule when "injustice might otherwise result."'" *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 837 n.3 (D.C. Cir. 2012) (internal citations omitted). As the documents cited herein "go 'to the heart of the contested issue, it would be inconsistent with this court's own equitable obligations…to pretend that they do not exist.'" *Id*. (internal citations omitted). Should this court believe the evidence should be considered for the first time in the district court, TTV requests that the case be remanded for that purpose. *See In re AOV Indus., Inc.*, 797 F.2d 1004, 1013 (1986) (remanding case for consideration of new evidence in order to "best serve the interests of justice and fairness").

omitted). According to the Congressional report, "The pressure to 'fix the problem,' as articulated by Lois Lerner, originated with President Obama and senior party leadership." *Id*.

Obama's Congressional allies exerted additional pressure on the IRS to target conservative groups. Senator Carl Levin (D-MI) wrote many letters demanding that the IRS take action to curtail the political activity of non-profit groups. *See, e.g.*, *id*. at 161. Further, there is evidence that the IRS collaborated with Members of Congress, "provid[ing] these Members with material and information for use in formal letters to the Commissioner." *Id*.

Although TTV has *never* involved itself in partisan campaign activity and exists for the sole purpose of protecting election integrity and voting rights, Representative Elijah Cummings (D-MD), Ranking Member of the House Oversight and Government Reform Committee, targeted TTV and openly questioned the purposes and mission of TTV, demanding extensive documentation from TTV regarding its activities. Oversight Report at 204-205.

Obama's public ridicule of conservative non-profit groups and the pressure exerted on the IRS to "fix the problem" correlated with a "culture of bias against conservative organizations among certain IRS employees," Oversight Report at 209-210, namely, Lerner, who referred to "Tea Party" groups as "very dangerous," *id*., Executive Summary at i. The widespread rhetoric from Administration

8

leadership led the IRS to hold a "deeply skeptical view" of applicants with perceived conservative philosophies, *id*., Executive Summary at ii, which would ultimately manifest itself as the Targeting Scheme.

Discriminatory treatment of targeted organizations during the application process was "just *one symptom* of the Administration's broader response to perceived shortcomings of federal campaign-finance law." *Id*., Executive Summary at i (emphasis added). The Ways and Means Committee discovered that the Targeting Scheme continued even after some groups' applications were approved. Through a process approved by Lerner, organizations similar to TTV were granted tax-exempt status but immediately were subjected to ongoing, heightened review, surveillance, and even potential audit. *See, e.g.*, House Ways and Means Committee, Boustany Opening Statement: Hearing on the Internal Revenue Service's Exempt Organizations Division Post-TIGTA Audit *(Remarks as Prepared)* (Sept. 18, 2013) (http://waysandmeans.house.gov/hearing-on-the-internal-revenue-services-exempt-organizations-division-post-tigta-audit/ (accessed Dec. 6, 2015)).[9]

### The IRS Developed the Targeting Scheme in Secret and Repeatedly Misled or Obstructed Congress's Investigations

From the onset, the IRS "covered up the misconduct and misled Congress

---

[9] TTV requests consideration of this document, *supra* n.8.

9

about the existence and nature of the targeting." Oversight Report, Executive Summary at v. When Congressional Democrats began to demonize the political speech of non-profit groups, high-ranking IRS officials believed the IRS would need to intervene. *Id.* at 88. Lerner proposed a "c4 project" that would scrutinize the activities of conservative-oriented non-profits. *Id.* However, Lerner carefully designed the scheme to not appear "per se political." *Id.*

Lerner also gave false information to congressional investigators. In February 2012, Lerner assured Congress that the criteria for evaluating tax-exempt applications had not changed at any point, when, in fact, Lerner herself had directed that the criteria be changed. *Id.* at 55. In April 2012, Lerner told congressional staff that the repeated information requests of groups like TTV were "in the ordinary course of the application process." *Id.* However, TIGTA found that "by April 25, 2012, the IRS had already identified seven types of information, including requests for donor information and policy positions, which it had inappropriately requested from conservative groups." *Id.* at 55-56. Yet on May 4, 2012, Lerner assured investigators that those questions were "not beyond the scope" of the application. *Id.* at 55.

On March 22, 2012, Appellee Shulman—then IRS Commissioner— appeared before a congressional committee. Chairman Boustany asked him, "Can you give us assurances that the IRS is not targeting particular groups based on

10

political leanings?" *Id*. at 57. Shulman responded, "[Y]es, I can give you assurances…. There is absolutely no targeting." *Id*. at 57-58. Later, Shulman acknowledged that he was aware of the application delays and the IRS's use of inappropriate questions when he testified. *Id*. at 59. Shulman's knowledge "suggests that he knowingly provided misleading testimony to Congress." *Id*. at 60.

The deception did not end with the departure of Lerner and Shulman. Rather, current IRS Commissioner Koskinen continues to mislead and obstruct Congress. In August 2013, the Oversight Committee subpoenaed from the IRS all correspondence sent or received by Lois Lerner since January 1, 2009. *Id*. at 71. The IRS failed to provide the documents. *Id*. On March 26, 2014, Commissioner Koskinen testified that the IRS would provide all of Lerner's emails. *Id*. But he knew then, and had since at least February 2014, that the IRS had "lost" Lerner's emails from January 1, 2009 to April 2011 due to an alleged "computer crash." *Id*. at 72. Yet he did not divulge that information. Not until June 13, 2014 did the IRS acknowledge the destruction of Lerner's emails. *Id*. at 66. Even then, its admission was buried in a twenty-seven page letter to the Senate Committee on Finance sent on a Friday afternoon. *Id*.

On June 20, 2014, Commissioner Koskinen testified that the IRS went to "great lengths" and made "extraordinary efforts" to recover Lerner's lost emails,

and that the IRS "confirmed that [email] backup tapes from 2011 no longer existed." Oversight Report at 75. Five months later, Commissioner Koskinen's testimony was proved false by TIGTA, which easily located approximately 30,000 of Lerner's "lost" emails on back-up tapes located in West Virginia. *Id*. at 76. Contrary to Commissioner's claims, the IRS *did not even search* all servers for the emails. *Id*. at 75. In sum, the "IRS has attempted to delay, frustrate, and impede the Committee's fact-finding." *Id*. at 199.

## SUMMARY OF THE ARGUMENT

The district court erroneously believed that the belated granting of TTV's application means that "allegedly unconstitutional governmental conduct…is no longer impacting [TTV]," and the claims for declaratory and injunctive relief are therefore moot. (JA-207.) The challenged conduct is not limited to mere delay. The delay of the application was but one *effect* of the "culture of bias" against perceived conservative groups that exists throughout the IRS and other government agencies. The simple granting of TTV's application did not, overnight, eliminate the chill on TTV's First Amendment rights. Nor did it eliminate the threat of injury through other manifestations of that bias in the IRS's ongoing regulation of TTV. The granting of TTV's application *did*, however, make public the confidential information that was demanded from TTV pursuant to the Targeting Scheme. TTV remains in continued need of relief and its claims are therefore not moot.

12

The court's finding that the Targeting Scheme has ceased and will not reoccur was based entirely on self-serving statements made by the IRS of questionable admissibility, which have been refuted by neutral, third-party, governmental actors. Justice requires that TTV be afforded the opportunity to test the veracity of the IRS's statements through discovery.

The Targeting Scheme also caused significant economic harm to TTV through legal expenses and tens of thousands of dollars in lost donations. (JA-62-63, ¶¶ 209-211.) The district court effectively held that no matter how egregious their actions, IRS officials cannot be held liable for damages. The court reached its holding despite clear legislative history demonstrating that Congress intended to preserve claims for damages under *Bivens*.

Lastly, TTV's claims regarding unlawful inspection of tax-return information unquestionably target the "discrete sphere of IRS activity" that Section 6103 was designed to regulate—"information handling." The district court erred by recasting TTV's claims as regarding unlawful *requests* for information and dismissing them without permitting the necessary discovery.

## ARGUMENT

### I.    Standard of Review

This Court reviews *de novo* the district court's dismissal for lack of subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, Fed. R.

13

Civ. P. 12(b)(6). *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) (citations omitted).

The dismissal of Counts II and V as moot is reviewed under Rule 12(b)(1). *Fund for Animals v. Mainella*, 335 F. Supp. 2d 19, 22 (D.D.C. 2004) This Court "must accept as true all of the factual allegations contained in the complaint." *Scandinavian Satellite Sys. v. Prime TV Ltd.*, 291 F.3d 839, 844 (D.C. Cir. 2002) (citations omitted).

This Court may also consider materials outside of the pleadings. "[T]he court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation omitted).

As with Rule 12(b)(1), this Court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), when reviewing a decision under Rule 12(b)(6). Rule 12(b)(6) also requires "construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## II.    The District Court Erred in Finding the Claims for Injunctive and Declaratory Relief Moot.

The district court erroneously believed that Counts II and V sought relief

solely from the prolonged delay in the processing of TTV's application for tax-exempt status. (JA-207.) The court therefore dismissed Counts II and V as moot, reasoning that the Targeting Scheme "is no longer impacting" TTV once TTV's application for exempt status was granted. (*Id.*) Yet as the Amended Complaint stated, Counts II and V do not seek relief from the delay; those Counts seek relief from current and future harms caused by the IRS's viewpoint discrimination. The mere granting of TTV's application did not provide complete relief for those injuries. TTV will continue to face irreparable harm absent an injunction.

### A. TTV Faces the Imminent Threat of Viewpoint Discrimination.

TTV's application was just the beginning of its interaction with the IRS. The IRS's Exempt Organizations (EO) division—the division that executed the Targeting Scheme—is required by law to oversee TTV's on-going compliance with the tax code. For example, the IRS reviews annually TTV's yearly tax-information returns, may audit and investigate TTV to assess whether it has properly maintained its tax-exempt status, and may impose penalties, including termination of tax-exempt status. 26 U.S.C. §§ 6033, 6684, 6852, and 7428. Unless enjoined, the threat remains that TTV will again be subjected to ongoing viewpoint discrimination based on its mission, statement, purpose, and philosophy.

The district court supported its conclusion that the threat of further discriminatory treatment was too "speculative" (JA-210), *entirely* with self-serving

and out-of-court statements made by the IRS on its website. Specifically, the court accepted as fact that the IRS had suspended the use of the "Be On the Lookout" list ("BOLO") and had taken remedial steps to address the alleged conduct. (JA-208, n.7.) The dismissal of TTV's claims cannot be sustained on such a scant and one-sided record for three reasons.

First, the court's "factual findings" are unreliable because the evidentiary foundation for them is the IRS itself. (*Id.*, n.7.) The IRS is not a neutral observer in this dispute. It is the party charged with a serious breach of the Constitution and the public's trust.

Indeed, the IRS has already demonstrated the need for fact-finding. Although the IRS claimed to have granted TTV's application in September 2013, it did not add TTV to its published list of approved charitable organizations until over *eight months later*, and did so only when undersigned counsel alerted the Government to the omission. Letters between Cleta Mitchell and Grover Hartt (May 9, 2014, May 16, 2014).[10] TTV learned that it was not listed as a recognized charity when a prospective donor attempted to confirm TTV's status on the IRS's website. TTV is left to wonder how many donations were lost as result of the IRS's failure to add TTV to its list of approved charities. Justice requires that *all* of the

---

[10] *Available at* http://publicinterestlegal.org/cases/true-the-vote-v-irs/. TTV requests consideration of these documents, *supra* n.8.

IRS's statements be tested through the discovery process.

Second, the accuracy of the court's "factual findings" is in dispute. In July 2015, the Government Accountability Office released a report ("GAO Report")[11] that specifically noted deficiencies in the "examination selection of existing exempt organizations" such as TTV. GAO Report at 2 n.3. The findings of the GAO Report refute the district court's conclusion that the threat of viewpoint discrimination has ceased.

The GAO found that there are still "several areas where EO's controls were not well designed or implemented." GAO Report at Highlights. These "control deficiencies…increase the risk that EO could select organizations for examination in an unfair manner—for example, based on an organization's religious, educational, political, or other views." *Id*. The GAO additionally found that "EO management does not consistently monitor selection decisions" and that "[s]taff could deviate from procedures for some selection processes without executive management approval." *Id*. These deficiencies "increase[] the risk of unfair selection of organizations' returns for examination." *Id*. So, the IRS has *not* alleviated the threat that TTV will again be subjected to viewpoint discrimination.

Third, the court erroneously equated the *alleged* suspension of the BOLO

---

[11]  *Available at* http://www.gao.gov/products/GAO-15-514 (last visited Dec. 5, 2015). TTV requests consideration of this report, *supra* n.8.

list with the *actual* suspension of the *entire* Targeting Scheme. (JA-208, n.7.) The BOLO list was simply a document containing viewpoint-based criteria that was used to subject applicants to the Targeting Scheme. It was one manifestation of the "culture of bias against conservative organizations." Oversight Report at 209. TTV's suit attacks viewpoint discrimination by the IRS *writ large*, and its allegations are thus much broader in scope than the one element identified by the district court. (*See* JA-63, Prayer for Relief at 3 (seeking injunction against Targeting Scheme and "any other similar practice or policy")).) Regardless, whether the BOLO list was suspended is largely irrelevant in light of the recent findings by GAO that the threat of the IRS using inappropriate criteria to target existing organizations for audit remains. TTV therefore remains in need of relief from the threat of future injury.

### B. The Targeting Scheme Continues to Injure TTV.

#### 1. TTV's First Amendment Rights Are Currently Chilled.

The Supreme Court "has viewed the importation of 'chill' as *itself* a violation of the First Amendment." *Dickerson v. United States*, 530 U.S. 428, 459 (2000) (Scalia, J., dissenting) (referencing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 342 (1974) and *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). TTV alleged that the Targeting Scheme was designed to, and did, chill "the freedom of speech and association rights of [TTV]…in violation of the First Amendment."

18

(JA-53, ¶¶ 151-52.) Specifically, the differential treatment of TTV "had a chilling effect on the willingness and ability of potential donors…to provide financial support to [TTV]," and "has impaired the expressive associational effectiveness of [TTV] and its members." (JA-53, ¶¶ 153-54.) The district court was required to accept these allegations as true. Instead, the court erroneously held that those injuries were remedied, in whole, by the mere recognition of TTV as a tax-exempt entity.

A "chilling effect" also constitutes an actionable injury where "the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). In *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984), the plaintiff alleged that he was subjected to an eight-month FBI investigation at the request of his employer, the Library of Congress, as a result of his association with a group affiliated with the Socialist Workers Party. *Id*. at 91. The plaintiff sought, *inter alia*, "an injunction against any Library requests for further investigations." *Id*. at 92. The court dismissed his complaint.

On appeal, this Court held that the plaintiff's claim for injunctive relief to prevent the chilling of his First Amendment rights could proceed because the defendants engaged in a "targeted investigation of an individual based solely on the exercise of his associational rights resulting in concrete harms." *Id*. at 93.

19

Similarly, apart from the unnecessary inquiries into TTV's activities and associations, the Targeting Scheme resulted in concrete harm to TTV, including the forfeiture of a $25,000 grant and the return of a $35,000 grant, both of which had been contingent on TTV receiving its tax-exempt status on a timely basis. (JA-62-63, ¶¶ 210-11.)

TTV was formed to espouse policy positions that triggered the IRS to inflict disparate treatment against it. TTV's mission and purpose remain the same. The well-documented bias evidenced by the IRS against TTV and other conservatives manifested itself in myriad ways *other* than the BOLO document and TTV is entitled to protection from such ongoing and future bias. The viewpoint discrimination includes not only a delayed granting of tax-exempt status, but the ability of the IRS to subject TTV to future disparate treatment through heightened surveillance, punishment of its donors, potential audits, and even the threat of future revocation of exempt status. Such IRS actions against conservatives are not illusory, but pose a real and ongoing threat of concrete harm to TTV. A live controversy remains and injunctive relief is therefore needed.

### 2. The IRS's Continued Possession of Materials Unlawfully Collected Pursuant to the Targeting Scheme Injures TTV.

TTV alleged that the IRS "made multiple, unnecessary, burdensome, and voluminous requests for information and documentation wholly unnecessary to the determination of [TTV's] tax-exempt status." (JA-46, ¶ 128.) TTV was effectively

20

forced to comply with all of those requests. (JA-34-35, ¶¶ 57, 64, 67.) The IRS admitted, and TIGTA confirmed, that many of those requests were propounded solely because of TTV's name, associations, and viewpoints. (JA-37-38, ¶¶ 77-81.) Despite that admission, the IRS remains in possession of all this material.

*Church of Scientology v. United States*, 506 U.S. 9 (1992) demonstrates that the IRS's continued possession of such material continues to injure TTV. In *Church of Scientology*, the IRS sought to enforce a summons that demanded access to tape-recorded conversations between church officials and their attorneys, along with certain other documents. *Id*. at 10. The church intervened to oppose production of the tapes. *Id*. at 11. The district court enforced the summons and the tapes were delivered to the IRS. *Id*. On appeal, the court held that the case was moot because the IRS already possessed the tapes. *Id*. at 11-12. The Supreme Court reversed, explaining,

> Taxpayers have an obvious possessory interest in their records. When the Government has obtained such materials as a result of an unlawful summons, that interest is violated and a court can effectuate relief by ordering the Government to return the records. Moreover, even if the Government retains only copies of the disputed materials, a taxpayer still suffers injury by the Government's continued possession of those materials, namely, the affront to the taxpayer's privacy. A person's interest in maintaining the privacy of his 'papers and effects' is of sufficient importance to merit constitutional protection.

*Id*. at 13.

Similarly, the IRS's "continued possession" of unlawfully collected

21

information constitutes an ongoing injury. This Court "[has] power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession," which "prevent[s] this case from being moot." *Id*. at 13.

### 3. The Public Disclosure of Materials Unlawfully Collected Pursuant to the Targeting Scheme Injures TTV.

By law, TTV's approved application—including any material collected pursuant to the unlawful Targeting Scheme—"is open to public inspection at the [IRS]." 26 U.S.C. § 6104(a)(1)(A). Like the public disclosure of campaign contributions, disclosure of TTV's expressive and associational activity injures TTV by chilling the First Amendment rights of TTV and its members. *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("compelled disclosure" imposes "significant encroachments on First Amendment rights"). The district court held that the injury caused by public disclosure of TTV's confidential information was both too "speculative" and "different than the [harm] identified in the complaint." (JA-210.) Neither contention is true.

There is nothing speculative about whether TTV's application is open to public inspection. The law requires it to be. The Government's suggestion below that a request for inspection must be made before TTV's injury is concrete and imminent ignores an enormous body of case law holding that the compelled disclosure of an organization's associations, internal communications, and other

expressive conduct chills First Amendment freedoms. *See, e.g.*, *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958); *AFL-CIO v. FEC*, 333 F.3d 168, 176-177 (D.C. Cir. 2003). These are the type of things TTV was forced to provide to the IRS and which are now open to public inspection. (JA-122 (asking TTV to "[d]escribe in detail the nature of [its] relationship" with the King Street Patriots); JA-118-120 (asking for details regarding training strategies and the materials used in training volunteers); JA-117, question 6 (asking for "minutes of all board meetings since your creation").)

Nor is the harm caused by public disclosure outside the scope of the Amended Complaint. The inclusion of information unnecessary to the determination of TTV's tax-exempt status as a part of TTV's permanent public file is a direct consequence of the Targeting Scheme, which forms the essence of this litigation. TTV's seeks to enjoin "further implement[ation]" of the Targeting Scheme (JA-63, Prayer for Relief at 3), which, now that the IRS has recognized its status, necessarily includes the public release of the information unlawfully collected by the IRS. (JA-56, ¶ 172 (recognizing that TTV's application would become public once approved).) The public release of that information, even if through the customary operation of Section 6104, is part and parcel of the IRS's improper actions this Court has been asked to review.

Because the threat of public disclosure of TTV's application constitutes an

ongoing injury, a live controversy remains, and this case is not moot.

### III.     The District Court Erred in Dismissing TTV's *Bivens* Claims.

In dismissing TTV's *Bivens* claims, the district court erroneously relied on materially distinguishable circuit case law—*Kim v. United States*, 632 F.3d 713 (D.C. Cir 2011)—and failed to fully apply the *Bivens* doctrine.

Under the proper standard, neither the IRC nor any other statutory scheme provides TTV an adequate, alternative remedy for protecting its constitutionally recognized interests, such that would preclude a *Bivens* remedy. In fact, the legislative history demonstrates that Congress intended the IRC's remedies to complement, not supplant, a remedy under *Bivens*.

#### A. The Bivens Standard.

*Bivens* provides for damages directly under the Constitution. The first step of the *Bivens* inquiry asks "whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason…to refrain from providing a new and freestanding remedy in damages." *Minneci v. Pollard*, 132 S.Ct. 617, 621 (2012) (internal citations omitted). Step two "is a subject of judgment." *Id*. Where no adequate, alternative remedy exists, the court must make a "remedial determination, paying particular heed…to any special factors counselling hesitation…." *Id*. The second prong is itself a multi-part inquiry that requires the court to "weigh[] reasons *for and against*" the creation of a *Bivens*

24

remedy." *Wilkie v. Robbins*, 551 U.S. 537, 554 (2007) (emphasis added).

The court typically first determines whether the plaintiff has access to a "statutory system of 'comprehensive procedural and substantive provisions giving meaningful remedies against the [Government].'" *Spagnola v. Mathis*, 859 F.2d 223, 226 (D.C. Cir. 1988) (quoting *Bush v. Lucas*, 462 U.S. 367, 368 (1983)). A "comprehensive remedial scheme" is one "special factor" that may weigh against the creation of a *Bivens* remedy, *Wilson v. Libby*, 535 F.3d 697, 705 (D.C. Cir. 2008), but it is not dispositive. This Court must still undertake three additional inquires: "whether [Congress] has 'not inadvertently' omitted damages remedies for certain claimants…, [whether Congress] has not plainly expressed an intention that the courts preserve *Bivens* remedies," *id*. at 706, and whether any "special factors" weigh *in favor* of a creation of a *Bivens* remedy," *Wilkie*, 551 U.S. at 554.

### B. No Adequate, Alternative Remedies Exist for TTV's Constitutional Injuries.

Relying on *Church by Mail, Inc. v. United States*, No. 87-0754, 1988 WL 8271 (D.D.C. Jan. 22, 1988), the district court dismissed the *Bivens* claim "'because Congress has created a specific, meaningful declaratory judgment remedy under 26 U.S.C. [§] 7428 for cases…in which an application for tax[-]exempt status has been denied.'" (JA-215.) That holding is erroneous for several reasons.

A *Bivens* remedy will not be precluded under the "adequate, alternative

25

remedy" prong absent an "explicit congressional declaration that persons injured…may not recover money damages…but must instead be remitted to another remedy, equally effective in the view of Congress." *Bivens*, 403 U.S. at 397. The proper inquiry is thus "whether Congress has created what it views as an *equally* effective remedial scheme. Otherwise the two can exist side by side." *Carlson v. Green*, 446 U.S. 14, 23 n.10 (1980).

While an alternative remedy "and a potential *Bivens* remedy need not be perfectly congruent," they must "provide roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims." *Minneci*, 132 S.Ct. at 625. For example, in *Carlson*, "four additional factors…support[ed the] conclusion that Congress did not intend to limit respondent to an FTCA action," 446 U.S. at 20-21, including the deterrent effect: "Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy." *Id*. at 21.

*Church by Mail* contains no application of the Supreme Court's "alternative remedy" standards. Its limited usefulness is highlighted by the fact that it predates *Minneci*, where the Supreme Court clarified that that an alternative remedy must "provide roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations." *Minneci*, 132 S.Ct. at 625. The district court should have applied the

26

*Minneci* standard. It did not. Nor did it point to anything in the text or legislative history of Section 7428 to suggest that Congress intended the declaratory judgment process to remedy constitutional violations. Nor could it have. The legislative history reveals that Congress enacted Section 7428 "to provide an effective appeal from an [IRS] determination that an organization is not exempt from tax, or is not an eligible donor for charitable contributions...." June 10, 1976 report of the Senate Committee on Finance on the Tax Reform Act of 1976 (HR 10612) at 587. Moreover, a *Bivens* action provides for an immediate action, whereas an organization seeking initial qualification of its status (like TTV did below) must wait *at least* 270 days before initiating a declaratory judgment proceeding. 26 U.S.C. § 7428(b)(2). As this Court recently observed, Congress did not intend to make applicants endure "blatant viewpoint discrimination" for the 270-day threshold under Section 7428. *Z St. v. Koskinen*, 791 F.3d 24, 32 (D.C. Cir. 2015). Section 7428 is "plainly...not a sufficient protector of the citizens' constitutional rights." *Carlson*, 446 U.S. at 23.

## C. "Special factors" Do Not Preclude a *Bivens* Remedy.

Because no adequate, alternative remedy is available, a *Bivens* remedy should exist unless "special factors" weigh against it. The "special factors" prong requires this Court to "weigh[] reasons for and against the creation of a new cause of action." *Wilkie*, 551 U.S. at 554. That analysis must ask: whether Congress "has

27

'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies," *Wilson*, 535 F.3d at 706, and whether any "special factors" weigh *in favor* of a creation of a *Bivens* remedy. *Wilkie*, 551 U.S. at 554. The district court completely omitted any discussion of these latter three inquires and instead relied exclusively on a materially distinguishable decision of this Court—*Kim v. United States*, 632 F.3d 713 (D.C. Cir. 2011).

### 1. *Kim* Is Materially Distinguishable, Omits Necessary Analysis, and Should be Limited to its Context.

Citing *Kim*, the district court held that "'no *Bivens* remedy was available in light of the comprehensive remedial scheme set forth by the [IRC].'" (JA-212.) However, the existence of a comprehensive remedial scheme is not dispositive on its own.[12] A closer look at *Kim* reveals why it does not preclude a *Bivens* action against IRS officials here.

*Kim* involved claims and claimants distinct from those present here. *See Wilson v. Libby*, 498 F. Supp. 2d 74, 86 (D.D.C. 2007) (*Bivens* is a highly "context-specific" inquiry). The claimants were "tax protestors" who filed a

---

[12] Notably, *Kim* lacks any meaningful application of the Supreme Court's *Bivens* doctrine and omits entirely an inquiry into whether Congress "has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Wilson*, 535 F.3d at 706. But Supreme Court and Circuit precedent mandate a more thorough inquiry. *Id*.

"boilerplate" complaint, which the district court described as "one of the many similar lawsuits brought in this jurisdiction by tax protesters alleging a variety of forms of misconduct by the IRS." *Kim v. United States*, 618 F. Supp. 2d 31, 34-35 (D.D.C. 2009). Such a factual situation is a far cry from the Targeting Scheme here.

The legal claims, too, are highly distinguishable. *Kim* was a textbook tax-protestor action. Although styled as "due process violations" under *Bivens*, the plaintiffs' allegations amounted to nothing more than claims that "they [were] not required to file individual income tax returns because the IRS did not maintain proper records or perform all duties required by law." *Kim*, 632 F.3d at 714. The plaintiffs' claims were a direct challenge to the IRS's core function—its taxing authority.

Consequently, there *is* a "legally cognizable distinction" between the claims made in *Kim* and those here. (JA-213.) Congress designed the IRC to resolve run-of-the-mill tax disputes, like the *Kim* plaintiffs's claims. As another court dealing with a tax-protester action explained, "Because Congress has comprehensively addressed the availability of damages *where IRS employees are alleged to have violated [the IRC]*, plaintiff may not bring a damages claim under *Bivens* for such violations under the mantle of due process." *Marsoun v. United States*, 591 F. Supp. 2d 41, 47-48 (D.D.C. 2008) (emphasis added).

29

Conversely, Congress did not design the IRC to deal with the unprecedented situation before this Court. Importantly, under contexts involving similar First Amendment interests, the Tenth Circuit has held that the IRC's comprehensiveness did not outweigh the plaintiffs' need for a *Bivens* remedy and "therefore recognized that the [plaintiff] may bring a *Bivens* action for violations of the first and fourth amendments." *Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240, 1248 (10th Cir. 1989); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1524 (10th Cir. 1994) (same); *see also Zherka v. Ryan*, 2014 U.S. Dist. LEXIS 140564 (S.D.N.Y. 2014) (adopting the Tenth Circuit's reasoning).

### 2. The District Court Ignored Legislative History Demonstrating that the IRC's Remedies Should Complement, not Preempt, *Bivens* Remedies.

*Kim* is not controlling because it also omits entirely the inquiry into whether Congress "has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Wilson*, 535 F.3d at 706. The district court repeated that error, ignoring clear legislative history demonstrating that Congress intended the IRC's remedies to complement, not preempt, *Bivens* remedies.

Below, the Cincinnati Appellees selectively pointed to portions of the legislative history of 26 U.S.C. § 7433—which permits an action against the

Government for a statutory violation during the collection of taxes—as evidence that Congress deliberately omitted damages remedies for constitutional violations. (Dkt. #64 at 23-24.) They pointed to two proposed bills that provided for a civil action against IRS employees who committed constitutional violations, both of which did not pass. *See* S. 579, 100th Cong., 1st Sess., § 3(a) (1987); H.R. 634, 100th Cong., 1st Sess., § 9(a) (1987). But there is more to the story.

One such bill was Senate Bill 579. 100th Cong., 1st Sess., § 3(a) (1987). Then-IRS Commissioner Lawrence B. Gibbs testified that Senate Bill 579's provision providing a cause of action for constitutional violations was not necessary because "[a] right of action against [IRS] employees currently exists…. *Bivens* suits are an available remedy for those whose Constitutional rights have been violated…." Taxpayers Bill of Rights: Hearings on S. 579 and S. 604 Before the Subcommittee on Private Retirement Plans and Oversight of the IRS of the Senate Committee on Finance at 243, 100th Cong., 1st Sess. 177 (Apr. 10, 1987) (statement of Lawrence B. Gibbs, Commissioner, IRS).

The next year, Congress proposed two similar bills to add Section 7433 to the IRC. As proposed, that legislation provided a civil remedy against any IRS employee that, "in connection with any determination or collection of Federal tax…carelessly, recklessly, or intentionally disregards any provision of Federal law, or any regulation promulgated under this title." S. 2238, 100th Cong., 2nd

Sess., § 779 (1988); H.R. 4333, 100th Cong., 2nd Sess. (1988). During consideration of this bill, a staff summary was entered into the record that explained that a cause of action under *Bivens* is already available against IRS officials.

> Presently, the only avenue open for taxpayers to recover losses sustained from wrongful actions by the IRS is a cause of action against IRS employees under *Bivens*…. *The courts have created a clear cause of action for injured taxpayers.*

134 Cong. Rec. 28285, 29273 (Oct. 7, 1988) (emphasis added). Two weeks later, Congress omitted from Section 7433 the language providing relief from violations of "Federal law," limiting such relief to violations of the IRC. *See Conference Report to Accompany H.R. 4333*, Vol. 2, 100th Cong. 2nd Sess. (Oct. 21, 1988).

In short, when Congress omitted statutory relief for constitutional injuries, *it did so with the explicit understanding that taxpayers already enjoyed a remedy for such injuries under Bivens.* "Where Congress decides to enact a statutory remedy which it views as fully adequate only in combination with the *Bivens* remedy…that congressional decision should be given effect by the courts." *Carlson*, 446 U.S. at 19 n.5. The district court, by looking to a factually distinguishable case, failed to abide by governing law.

Congress and the IRS have both "expressed an intention that the courts preserve *Bivens* remedies." *Wilson*, 535 F.3d at 706. As a result, the existence of

the IRC, even if considered a "comprehensive remedial scheme," does not foreclose a *Bivens* remedy for TTV's constitutional injuries. By reaching the contrary conclusion, the district court erred.

## IV.   The District Court Erred In Dismissing Count IV.

IRC Section 7431 permits a taxpayer to bring a damages action for knowing or negligent inspection of tax-return information. The district court dismissed TTV's claims under Section 7431 for two primary reasons, neither of which provides a basis for dismissal, especially at this early stage in the litigation.

First, the district court erroneously recast TTV's complaint as challenging the IRS's "acquisition" of TTV's application material, a complaint the court then dismissed as being outside the purview of Section 6103. Second, the district court held that any allegations concerning unlawful inspection of its application material were "insufficiently pleaded," solely because TTV did not describe the entire universe of unlawful inspections in the Amended Complaint. For the reasons that follow, the court's dismissal of TTV's claims should be reversed.

### A. Count IV Alleges Improper Inspection, not Acquisition, of its Application Material.

The district court misunderstood TTV's claims, stating that "the basis for the plaintiff's alleged violation of 26 U.S.C. § 6103 is not the inspection of tax-return information; rather, it is the defendants' request for allegedly unnecessary information during the tax-exempt application process." (JA-219 n.18.) That

33

interpretation is contrary to the plain language of the Amended Complaint, which provides: "[P]ursuant to 26 U.S.C. § 7431, statutory and/or actual and punitive damages caused by the U.S. Government's willful, unauthorized inspection of [TTV's] confidential tax-return information in violation of 26 U.S.C. § 6103[.]" (JA-24, ¶ 13(d).) The Amended Complaint explains that Section 6103 was violated in this case because such inspections were not conducted for a "tax administration purpose" in that (1) "the IRS Defendants knew or should have known [the inspections] to be unnecessary to the determination of [TTV's] tax-exempt status" (JA-57, ¶ 177); or (2) the IRS Defendants knew or should have known such inspections were conducted solely "in furtherance of the IRS Defendants' discriminatory and unconstitutional Targeting Scheme," (JA-57, ¶ 178).

When TTV's claims are properly understood, the cases on which the district court relied become irrelevant. (JA-218-219.) In fact, that was the conclusion reached by a federal district court in Ohio hearing identical unlawful inspection claims. *NorCal Tea Party Patriots v. IRS*, 2014 U.S. Dist. LEXIS 97229 (S.D. Ohio 2014). In *NorCal*, the court prudently recognized that the plaintiffs "den[ied] that their claim is based solely upon the improper requests for information." *Id*. at *41. The court also recognized that the case was "only at the Rule 12(b)(6) stage," *id*., and it would therefore be improper to dismiss the claims before the plaintiffs

34

were given a chance to conduct discovery and present evidence concerning the purpose for which the IRS inspected the plaintiffs's information, *id*. at *44.

The district court here should have reached the same conclusion. Instead, the court erred by relying on cases in which the Government's liability was premised *solely* on defects in the validity of the underlying tax-collection action. *See Huff v. United States*, 10 F.3d 1440, 1447 (9th Cir. 1993) ("defects in the IRS's collection procedures underlying the levy notices"); *Venen v. United States*, 38 F.3d 100, 104 (3d Cir. 1994) ("underlying levies were unlawful"); *Wilkerson v. United States*, 67 F.3d 112, 116-17 (5th Cir. 1995) (same); *Mann v. United States*, 204 F.3d 1012, 1018 (10th Cir. 2000) (same). Like the *NorCal* plaintiffs, TTV's "denies that [its] claim is based solely upon the improper requests for information." *NorCal*, 2014 U.S. Dist. LEXIS 97229 at *41.

Furthermore, the cases on which the district court relied concerned a distinct context that is not relevant here—tax collection activity. *See Huff*, 10 F.3d at 1447; *Venen*, 38 F.3d at 101; *Wilkersons*, 67 F.3d at 114; *Mann*, 204 F.3d at 1014. That distinction is important for at least two reasons. First, Congress expressly authorized disclosure of tax-return information in collection actions: Section "6103(k)(6) and the relevant regulations do permit disclosure of tax return information when made in notices of lien and levy, to the extent necessary to collect on taxes assessed." *Mann*, 204 F.3d at 1018. Although each plaintiff in the

cases relied upon by the district court claimed that the disclosures were unauthorized, no plaintiff claimed that the disclosures were unnecessary to effectuate the levy. Because "[t]he plain language of [the IRC] authorizes disclosures to the extent necessary to effectuate a levy," *Wilkerson*, 67 F.3d at 116, the courts rejected the plaintiffs' attempt to premise liability solely upon the *ultimate* validity of the collection action. *Id.*

Second, in the tax collection arena, Congress was explicit about its intention to preserve a dichotomy of relief. Indeed, Section 7433 states it is the "exclusive remedy for recovering damages resulting from [collection] actions." 26 U.S.C. § 7433. In the context of an improper collection action, it might make sense to reject reliance on Section 7431 when the invalidity of the disclosure is based *solely* on the invalidity of the collection action, because if the "disclosures necessary to effectuate levies become wrongful when the levies are adjudged deficient, then [Section 7433] would essentially become a nullity." *Wilkerson*, 67 F.3d at 117 n.8.

The district court believed that the availability of a declaratory judgment action under Section 7428 likewise precludes TTV's claims here. (JA-219.) Yet Section 7428 bears none of the features of Section 7433. Section 7428 contains no exclusivity provision and does not provide for money damages. Most importantly, Section 7433 contains no temporal threshold, whereas Section 7428 requires an

36

applicant to wait at least 270 days after filing an application. Section 7428 will not become a "nullity" if TTV's claims proceed under Section 7431.

*Chandler v. United States*, 687 F. Supp. 1515 (D. Utah 1988), *aff'd per curiam*, 887 F.2d 1397 (10th Cir. 1989) is persuasive here. In *Chandler*, the taxpayers remitted payment to the IRS to satisfy a frivolous return penalty. *Id*. at 1516. However, the IRS failed to credit the taxpayer's account, causing the account to appear delinquent. *Id*. Consequently, the IRS issued a notice of levy to the plaintiff's employer to collect the penalty. *Id*. The taxpayers sued to recover damages caused by that disclosure. *Id*.

The claim was actionable because "the levy was a result of negligence on the part of IRS personnel." *Id*. at 1521. As described by the Tenth Circuit, "The *Chandler* holding was based on the fact that the IRS acted unreasonably and negligently in pursuing collection efforts against the taxpayers after the taxpayers had already remitted the demanded payment." *Mann*, 204 F.3d at 1019. "[I]f not for this negligence, the levy containing the disclosures would not have been issued." *Id*. The same is true here. There was never any lawful reason to issue additional, burdensome information requests to TTV other than viewpoint discrimination. Even if the application process began under the ordinary course of business, "there was no justification for continuing" to request or inspect additional information other than viewpoint discrimination. *Id*. The inspections at issue in this

37

case were at the very least the "result of negligence on the part of IRS personnel" who devised and carried out the Targeting Scheme.

Properly understood, there is no question that TTV's claims properly target the "discrete sphere of IRS activity" that Section 6103 was designed to regulate—"information handling." (JA-217.) As in *NorCal*, TTV's unlawful inspection claims should not be dismissed, but should be tested through the fact-finding process.

### B.  TTV's Claims Were Sufficiently Pleaded.

The "short and plain statement" pleading standard of FRCP 8(a)(2) governs TTV's Section 7431 claims. However, the district court held that TTV's claims were "insufficiently pleaded." (JA-217.) The only explanation for this holding—as far as Rule 8 is concerned—comes in an explanatory parenthetical that relies on *Iqbal* for the principle that "conclusory allegations 'are not entitled to the assumption of truth[.]'" (*Id*.) The district court continued: "The insufficiency of the plaintiff's allegations is highlighted by the plaintiff's admission that '[t]he number of unauthorized inspections of [the plaintiff]'s return information and the identity of those who made the inspections cannot be completely and accurately ascertained at this time....'" (*Id*. (quoting JA-58, ¶ 182).)

However, whether TTV can ascertain the *entire* universe of unlawful inspections says nothing about whether TTV has properly pleaded the existence  of

38

*any* unlawful inspections. TTV identified specific requests for information that TIGTA identified (JA-156), as unnecessary for the determination of TTV's tax-exempt status, (JA-46-49, ¶¶ 129(a)-(j)). TTV further identified the dates on which this information was demanded and provided to the IRS (JA-58, ¶ 180), and those individuals known to have inspected it, (*id.* ¶ 181). Furthermore, the Government has admitted that entire spheres of information were requested and inspected solely because of the applicant's perceived viewpoint. (JA-37 ¶¶ 77-78; Dkt. 54 at 14.) There is nothing "conclusory" about those allegations.

Where "[a] plaintiff allege[s] a Section 7431 claim," his short and plain statement need only "provide the United States with fair notice of the allegations made." *Dean v. United States*, 2010 U.S. Dist. LEXIS 29576, *11 (D.N.J. 2010). A pleading is sufficient if it "allow[s] the United States to determine whether the disclosure [or inspection] was authorized by § 6103 or fits within one of its many exceptions." *May v. United States*, 1992 U.S. Dist. LEXIS 16055, *14 (W.D. Mo. Apr. 17, 1992). It is clear that the Government has received "fair notice of the allegations made." *Dean*, 2010 U.S. Dist. LEXIS at *11. Indeed, the Government asserted that the inspections were both requested by TTV (Dkt. #54 at 12-13) and "authorized" under one of Section 6103's enumerated exceptions, (Dkt. #54 at 13-14). Regardless of their merit, these assertions demonstrate the sufficiency of the pleadings. *See May*, 1992 U.S. Dist. LEXIS 16055 at *7 ("By having the alleged

illegally [inspected] information properly pleaded, the Defendant is able to identify which exception, if any, the disclosure will fall into under § 6103.").

This Court must construe "the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart*, 471 F.3d at 173. From the Government's concessions and TTV's detailed allegations concerning certain inspections and the known involvement of certain named individuals, (*e.g.*, JA-36-45, ¶¶ 73-123),—as confirmed by the TIGTA Report (JA-130) and the Oversight Report—this Court may reasonably infer that *additional* return information was improperly inspected by named and unnamed individuals for purposes not authorized by Section 6103, at dates and times to be proved through the discovery process. The district court's dismissal of TTV's claims based on its inability to describe *every* illegal inspection of its return information was clearly erroneous.

40

## CONCLUSION

TTV requests reversal and remand for further proceedings.


Dated: December 7, 2015

Respectfully submitted,


Cleta Mitchell
Michael J. Lockerby
FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, DC 20007
(202) 672-5300 (telephone)
(202) 672-5399 (fax)
mlockerby@foley.com
cmitchell@foley.com
*Lead Counsel for Appellant*

William E. Davis
Mathew D. Gutierrez
FOLEY & LARDNER, LLP
One Biscayne Tower
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8404 (telephone)
(305) 482-8600 (fax)
wdavis@foley.com
mgutierrez@foley.com
*Counsel for Appellant*


     /s/ Noel H. Johnson
Kaylan L. Phillips
Noel H. Johnson
PUBLIC INTEREST LEGAL FOUNDATION
209 West Main Street
Plainfield, IN 46168
(317) 203-5599 (telephone)
(888) 815-5641 (fax)
kphillips@publicinterestlegal.org
njohnson@ publicinterestlegal.org
*Counsel for Appellant*

John C. Eastman
CENTER FOR CONST'L JURISPRUDENCE
c/o Chapman University Fowler
School of Law
One University Drive
Orange, CA 92866
(877) 855-3330 x2 (telephone)
(714) 844-4817 (fax)
jeastman@chapman.edu
*Counsel for Appellant*

41

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of this Court's order, dated September 23, 2015, because this brief contains 8,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R.App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.


Dated: December 7, 2015                    ___/s/ Noel H. Johnson_____
                                           Noel H. Johnson
                                           PUBLIC INTEREST LEGAL FOUNDATION
                                           209 West Main Street
                                           Plainfield, IN 46168
                                           (317) 203-5599 (telephone)
                                           (888) 815-5641 (fax)
                                           njohnson@ publicinterestlegal.org
                                           *Counsel for Appellant*

42

**ADDENDUM**

## Table of Contents – Addendum

26 U.S.C. §§ 7428 ................................................................................1

26 U.S.C. §§ 7431 ................................................................................4

**26 U.S.C. § 7428**

Declaratory judgments relating to status and classification of organizations under section 501(c)(3), etc.

(a) Creation of remedy.  In a case of actual controversy involving--

(1) a determination by the Secretary--

(A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) [IRC Sec. 501(c)(3)] which is exempt from tax under section 501(a) [IRC Sec. 501(a)] or as an organization described in section 170(c)(2) [IRC Sec. 170(c)(2)],

(B) with respect to the initial classification or continuing classification of an organization as a private foundation (as defined in section 509(a) [IRC Sec. 509(a)]),

(C) with respect to the initial classification or continuing classification of an organization as a private operating foundation (as defined in section 4942(j)(3) [IRC Sec. 4942(j)(3)]), or

(D) with respect to the initial classification or continuing classification of a cooperative as an organization described in section 521(b) [IRC Sec. 521(b)] which is exempt from tax under section 521(a) [IRC Sec. 521(a)], or

(2) a failure by the Secretary to make a determination with respect to an issue referred to in paragraph (1),

upon the filing of an appropriate pleading, the United States Tax Court, the United States Claims Court [United States Court of Federal Claims], or the district court of the United States for the District of Columbia may make a declaration with respect to such initial qualification or continuing qualification or with respect to such initial classification or continuing classification. Any such declaration shall have the force and effect of a decision of the Tax Court or a final judgment or decree of the district court or the Claims Court [Court of Federal Claims], as the case may be, and shall

1

be reviewable as such. For purposes of this section, a determination with respect to a continuing qualification or continuing classification includes any revocation of or other change in a qualification or classification.

(b) Limitations.

(1) Petitioner.  A pleading may be filed under this section only by the organization the qualification or classification of which is at issue.

(2) Exhaustion of administrative remedies.  A declaratory judgment or decree under this section shall not be issued in any proceeding unless the Tax Court, the Claims Court [Court of Federal Claims], or the district court of the United States for the District of Columbia determines that the organization involved has exhausted administrative remedies available to it within the Internal Revenue Service. An organization requesting the determination of an issue referred to in subsection (a)(1) shall be deemed to have exhausted its administrative remedies with respect to a failure by the Secretary to make a determination with respect to such issue at the expiration of 270 days after the date on which the request for such determination was made if the organization has taken, in a timely manner, all reasonable steps to secure such determination.

(3) Time for bringing action.  If the Secretary sends by certified or registered mail notice of his determination with respect to an issue referred to in subsection (a)(1) to the organization referred to in paragraph (1), no proceeding may be initiated under this section by such organization unless the pleading is filed before the 91st day after the date of such mailing.

(4) Nonapplication for certain revocations.  No action may be brought under this section with respect to any revocation of status described in section 6033(j)(1) [IRC Sec. 6033(j)(1)].

(c)Validation of certain contributions made during pendency of proceedings.

(1)In general.  If

(A) the issue referred to in subsection (a)(1) involves the revocation of a determination that the organization is described in section 170(c)(2)

2

[IRC Sec. 170(c)(2)],

(B)a proceeding under this section is initiated within the time provided by subsection (b)(3), and

(C)either--

(i)a decision of the Tax Court has become final (within the meaning of section 7481) [IRC Sec. 7481], or

(ii)a judgment of the district court of the United States for the District of Columbia has been entered, or

(iii)a judgment of the Claims Court [Court of Federal Claims] has been entered,and such decision or judgment, as the case may be, determines that the organization was not described in section 170(c)(2) [IRC Sec. 170(c)(2)],then, notwithstanding such decision or judgment, such organization shall be treated as having been described in section 170(c)(2) [IRC Sec. 170(c)(2)] for purposes of section 170 [IRC Sec. 170] for the period beginning on the date on which the notice of the revocation was published and ending on the date on which the court first determined in such proceeding that the organization was not described in section 170(c)(2) [IRC Sec. 170(c)(2)].

(2) Limitation.  Paragraph (1) shall apply only--

(A) with respect to individuals, and only to the extent that the aggregate of the contributions made by any individual to or for the use of the organization during the period specified in paragraph (1) does not exceed $ 1,000 (for this purpose treating a husband and wife as one contributor), and

(B) with respect to organizations described in section 170(c)(2) [IRC Sec. 170(c)(2)] which are exempt from tax under section 501(a) [IRC Sec. 501(a)] (for this purpose excluding any such organization with respect to which there is pending a proceeding to revoke the determination under section 170(c)(2) [IRC Sec. 170(c)(2)]).

3

(3) Exception.  This subsection shall not apply to any individual who was responsible, in whole or in part, for the activities (or failures to act) on the part of the organization which were the basis for the revocation.

(d) Subpoena power for district court for District of Columbia.  In any action brought under this section in the district court of the United States for the District of Columbia, a subpoena requiring the attendance of a witness at a trial or hearing may be served at any place in the United States.

---

**26 U.S.C. § 7431**

Civil damages for unauthorized inspection or disclosure of returns and return information.

(a)In general.

(1)Inspection or disclosure by employee of United States.  If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103 [IRC Sec. 6103], such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

(2)Inspection or disclosure by a person who is not an employee of United States.  If any person who is not an officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103 [IRC Sec. 6103] or in violation of section 6104(c) [IRC Sec. 6104(c)], such taxpayer may bring a civil action for damages against such person in a district court of the United States.

(b)Exceptions.  No liability shall arise under this section with respect to any inspection or disclosure--

(1)which results from a good faith, but erroneous, interpretation of section 6103 [IRC Sec. 6103], or

4

(2)which is requested by the taxpayer.

(c)Damages.  In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of--

    (1)the greater of--

        (A)$ 1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or

        (B)the sum of--

            (i)the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus

            (ii)in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus

    (2)the costs of the action, plus

    (3)in the case of a plaintiff which is described in section 7430(c)(4)(A)(ii) [IRC Sec. 7430(c)(4)(A)(ii)], reasonable attorneys fees, except that if the defendant is the United States, reasonable attorneys fees may be awarded only if the plaintiff is the prevailing party (as determined under section 7430(c)(4) [IRC Sec. 7430(c)(4)]).

(d)Period for bringing action.  Notwithstanding any other provision of law, an action to enforce any liability created under this section may be brought, without regard to the amount in controversy, at any time within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure.

(e)Notification of unlawful inspection and disclosure.  If any person is criminally charged by indictment or information with inspection or disclosure of a taxpayer's return or return information in violation of--

    (1)paragraph (1) or (2) of section 7213(a) [IRC Sec. 7213(a)],

(2)section 7213A(a) [IRC Sec. 7213A(a)], or

(3)subparagraph (B) of section 1030(a)(2) of title 18, United States Code,

the Secretary shall notify such taxpayer as soon as practicable of such inspection or disclosure.

(f)Definitions.  For purposes of this section, the terms "inspect", "inspection", "return", and "return information" have the respective meanings given such terms by section 6103(b) [IRC Sec. 6103(b)].

(g)Extension to information obtained under section 3406.  For purposes of this section--

(1)any information obtained under section 3406 [IRC Sec. 3406] (including information with respect to any payee certification failure under subsection (d) thereof) shall be treated as return information, and

(2)any inspection or use of such information other than for purposes of meeting any requirement under section 3406 [IRC Sec. 3406] or (subject to the safeguards set forth in section 6103 [IRC Sec. 6103]) for purposes permitted under section 6103 [IRC Sec. 6103] shall be treated as a violation of section 6103 [IRC Sec. 6103].

For purposes of subsection (b), the reference to section 6103 [IRC Sec. 6103] shall be treated as including a reference to section 3406 [IRC Sec. 3406].

(h)Special rule for information obtained under section 6103(k)(9).  For purposes of this section, any reference to section 6103 [IRC Sec. 6103] shall be treated as including a reference to section 6311(e) [IRC Sec. 6311(e)].

6

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on December 7, 2015. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: December 7, 2015            /s/ Noel H. Johnson
                                   Noel H. Johnson
                                   PUBLIC INTEREST LEGAL FOUNDATION
                                   209 West Main Street
                                   Plainfield, IN 46168
                                   (317) 203-5599 (telephone)
                                   (888) 815-5641 (fax)
                                   njohnson@ publicinterestlegal.org
                                   *Counsel for Appellant*